UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| TONYA JONES, Administratrix of the Estate of John Daulton, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 2: 23-164-DCR |
| V. | ) ) | |
| KENTON COUNTY, KENTUCKY, et al., | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

At approximately 2:55 p.m. on May 14, 2023, John Daulton ("Daulton") was beaten into a coma by fellow inmate Johnathan Maskiell ("Maskiell") in an isolation cell at the Kenton County Detention Center ("KCDC") in Covington, Kentucky. He died one week later because of the assault. Tonya Jones initiated this action as the administratrix of Daulton's estate, bringing claims against Kenton County and multiple individual defendants.[1] The matter is pending for consideration of the defendants' motion for summary judgment. [Record No. 46] For the foregoing reasons, the motion will be granted, in part, and denied, in part.

## I. Background

Daulton was arrested on May 13, 2023, at 7:51 p.m., by Covington police based on an outstanding warrant alleging a probation violation. [Record No. 54, p. 1] He was booked into

---

[1]    The defendants include Kenton County, Kentucky, jailer Marc Fields in his official capacity, and deputy jailers Jared Capps and Kristin Wehrer.

- 1 -

the KCDC at 8:10 p.m.  [Record No. 33, p. 4]  The next day, Daulton was fatally assaulted by Maskiell.

### A.  The KCDC:

**The Booking Process**

When an inmate is booked into the KCDC, an intake officer typically completes an intake assessment which includes questions addressing, among other things, whether the person is potentially dangerous, under the influence of drugs, experiencing mental health issues, or requires medical assistance.  [Record No. 46-5]  The form utilized for the intake contains three sections—one contains questions for the arrestee, another contains questions for the arresting officer, and a third is labeled "deputy assessment questions."  [*Id.*]  This procedure was purportedly implemented to collect and retain information useful to jail staff.  But when it came to the arresting officer questions, it was rarely followed in practice.

For example, intake Deputy Kristin Wehrer admitted that "[a] lot of these questions I feel as if we don't have to physically ask.  We could interpret it based on their behavior." [Record No. 46-3, p. 22]  And when asked if her procedure was according to training, Wehrer answered in the affirmative.  [*Id.*, p. 23] The failure to fill out the intake assessment form is also corroborated by Kenton County police officers who are expected to answer the questions. Specifically, Kenton County police officers Sam Matthews and Alexandra Rose testified that over the course of six years "they were never asked those questions and had never seen the Intake Assessment Form," despite the fact that "[a]ll their adult arrestees would be taken to Kenton County Jail."  [Record No. 54, pp. 21-22] After the first intake assessment, inmates

are asked a series of standard medical questions which include prompts about medical conditions, drug abuse, prescriptions, and suicidal thoughts.  [*See* Record No. 5-3, p. 2]

**New Vista**

Following booking, KCDC staff have the discretion to contact a third-party non-profit organization (New Vista)[2] based on the responses to the medical questionnaire.[3]  New Vista "focuses primarily upon suicide prevention and the management of an inmate in mental health crisis." [Record No. 54, p. 2]  Essentially, the intake officer calls New Vista and a short mental health assessment (referred to as "jail triage") takes place.  According to New Vista:

> Jail Triage facilitates a timely and reasonable response intended to prevent harm and assure defensibility if serious harm should occur.  And Jail Triage is a voluntary program made available to Kentucky's county jails . . . with a focus on providing suicide assessment and risk management for inmates . . .  This also helps jails manage their liability.

[Record No. 54, p. 3 (internal quotation marks omitted).]  New Vista clinicians determine whether to place an inmate on "High Watch" in an isolation cell.  [*See* Record No. 46-14.] The recommendation is based on a phone call between New Vista staff and the jail booking officer.  [Record No. 54, p. 2]  However, KCDC has only four designated isolation cells for male prisoners.  As a result, when more than four inmates are put on high watch, inmates are must double-up.  [*Id.*]  But New Vista clinicians were not aware of this limitation because they are located off-site.  [*Id.*, pp. 2-3]  Further, the clinicians do not have direct contact with inmates.  Instead, triage is conducted based on the conversation with the deputy located at the

---

[2]    New Vista was formerly known as Bluegrass Mental Health.

[3]    Kenton County Jail Policy 3.4.8 III(A)(e) provides: "The medical questionnaire will be administered and depending upon the responses it may be necessary to notify Blue Grass Mental Health Triage."  [Record No. 33, p. 6]

detention center.  [*Id.*, p. 2] And while New Vista staff is off-site and do not communicate with inmates, the opinions of New Vista clinicians supersede any cell-placement recommendations made by officials who are on site, including jail nursing staff.  [*Id.*, pp. 3-5]

Finally, Jones alleges that KCDC has a custom of not allowing other unoccupied cells to be converted into isolation cells when more than four inmates are placed on high watch.  As a result, inmates are required to share "isolation cells" although alternative isolated cell placements are available.  [*Id.*, p. 23]

### JailTracker

KCDC uses an informational software system ("JailTracker") to maintain data regarding inmates.  [Record No. 44, p. 3]  A feature within JailTracker ("institutional alerts") flags past events and considerations related to inmates which includes their dangerous propensities.  [*Id.*]  Ostensibly, the system assists detention center staff in determining inmates suitable for general population versus those who are not based on dangerous and/or suicidal potential.  It appears, however, that information input by staff into JailTracker is limited.  [*Id.*]  Booking Commander Terri Robinson testified that only events occurring within KCDC would be input into JailTracker.[4]  [Record No. 54, p. 11]  Thus, if a current KCDC inmate assaulted multiple inmates at another detention facility but had no similar encounters at KCDC, an alert would not appear on JailTracker.  [Record No. 46-16, pp. 7-8]  And according to Robinson's testimony, as of October 24, 2024, (17 months after Maskiell assaulted Daulton) there was no "alert" on Maskiell's JailTracker profile.  [Record No 54, p. 12]

---

[4]    The defendants designated Robinson as "the person who could most knowledgeably speak about … JailTracker."  [Record No. 44, p. 3]

**B.  The Events of May 13 and 14, 2023:**

**John Daulton**

Defendant Jared Capps ("Capps") conducted the intake screening process when Daulton was arrested and booked into the KCDC at 8:10 p.m.  [Record No. 46-8, p. 10; Record No. 5-3]  Capps testified that Daulton refused to answer questions from the intake assessment form.  Capps left the form blank because he "had dealt with [Capps] on numerous occasions" and "the behavior [Capps] was displaying was really not out of the usual for him."  [*Id.*, p. 11]  At 9:19 p.m., Daulton answered the "standard medical questions."  [Record No. 6-3]  The form indicates that Daulton stated he was suffering from depression.  [*Id.*]

Based on Daulton's admission of depression, Defendant Kristin Wehrer called New Vista at 1:45 a.m. to conduct triage.  [Record No. 33, p. 5] "The phone call [with clinician Kim McCallister] . . . lasted for three minutes and resulted in Daulton being placed on 'High Watch' for 'Depression' . . .  for 24 hours."  [*Id.*, p. 6] "Ms. McAllister had never met or spoken to Daulton."  [*Id.*]  Thereafter, Daulton was placed in "isolation" cell 125A.  [Record No. 54, p. 5]  McCallister later testified that she was not aware that male inmates would be doubled up when more than four were designated to high watch status, and as far as she knew, there was no way for inmates to be removed from high watch for any reason without calling New Vista.  [Record No. 46-15, pp. 38 and 43-44]

**Johnathan Maskiell**

Approximately four hours after Daulton's arrest, (but before Daulton was moved to an isolation cell), Covington police officer Alexandra Rose found Maskiell walking on the shoulder of Interstate 75 in Kenton County.  [Record No. 33, p. 7]  While arresting Maskiell,

- 5 -

Rose discovered that Maskiell had recently left a mental institution, was hearing voices, and had recently escaped from a half-way house for inmates in nearby Hamilton County, Ohio. [*Id.*, p. 8]  Maskiell told Rose he was punching the ground because he was crazy and running from police.  [Record No. 54-4, p. 2]  Rose also noticed that Maskiell had blood on his hands and pants.  [Record No. 46-3, pp. 22-24] Maskiell's arrest citation included "caution-violent tendencies/prev arrest."  [Record No. 46-2; Record No. 9-1, p. 6]

At 12:47 a.m. on May 14, Maskiell's mother (Jeanette Pies) called 911 to warn authorities that Maskiell was unstable and potentially dangerous.  [Record Nos. 46-19, p. 2, Record No. 46-1, p. 8]  However, while the information was conveyed to Rose, it did not reach KCDC before Daulton was attacked.  [Record No. 46-1, p. 8]  Pies also called KCDC, but this call may have taken place the day after the assault of Daulton had already occurred.  [Record No. 46-17, pp. 42-43]  In addition, earlier emails among Talbert House staff where Maskiell had recently escaped indicate fears that Maskiell would "get into an altercation with another client" or that he would "put himself into a dangerous situation due to his disorientation." [Record No. 54-5, p. 2]

Maskiell arrived at KCDC and was booked by Defendant Kristin Wehrer.  [Record No. 5-5] Wehrer did not ask officer Rose any questions from the intake assessment form, including queries related to dangerousness, drug and/or alcohol use, or mental health issues.  [Record No. 54, p. 7]  Rose testified that, had she been asked, she would have described Maskiell's strange behavior in response to those questions.  [*Id.*]  Instead, Wehrer checked all the boxes on the form that indicated "no," although some questions related to mental illness and suicidal tendencies.  Instead, Wehrer noted "attempted suicide . . . doesn't know when".  [Record No.

46-5]  Rose gave Wehrer the citation indicating that Maskiell had violent tendencies, and the jail entered it into JailTracker [Record No. 54, p. 8]; however, an alert was not created.  Wehrer did not asked the questions from the intake assessment form and had no reason to know that Maskiell had escaped from the Talbert House.

At 4:45 a.m., Capps called New Vista to arrange triage for Maskiell.  [*Id.*, p. 9; Record No. 46-11]  Capps informed New Vista clinician Kim Snapp that Maskiell had attempted suicide previously, and that he might have been the oddest person Capps had seen in the jail. [Record No. 46-11] Notwithstanding this observation, it does not appear that Capps checked JailTracker to obtain additional information regarding Maskiell.  [Record No. 44, p. 4][5]

Snapp ordered Maskiell on high watch for 24 hours.  [*Id.*]  However, Snapp later testified that she did not know inmates placed in isolation could be doubled up, and that there was potential for danger when inmates intended to be isolated are housed together.  [Record No. 46-12, pp. 17 and 20]  Following the call, Capps took Maskiell to the Zulu ward of KCDC where inmates are held in isolation cells.  [Record No. 54, p. 10]  But at that time, all isolation cells were occupied.  Capps chose to put Maskiell with Daulton, rather than Rickey Cornell, a black inmate, because Maskiell had a swastika tattoo and used the n-word.  [Record No. 33, p. 10]  Capps believed it would be the safest option for everyone.  [*Id.*]

Daulton did not wish to be on high watch.  [*Id.*, p. 6]  At 9:50 a.m. on May 14, 2023, he stated to jail nurse Whitney Price and deputy William Poore, "you all put me on suicide

---

[5]     Records of Maskiell's "violent tendencies" which appeared in Rose's arrest report would not trigger a JailTracker alert, because the relevant conduct took place outside KCDC. [*Id.*]  "Instead, it was listed within a confusing sea of data that Capps did not access." [*Id.*; Record No. 44-3]

watch for nothin'." [*Id.*]  Poore informed him that the decision was made by New Vista, and it had nothing to do with him or Price.  [*Id.*]

Nurse Price knew Daulton pretty well.  Daulton was at KCDC for a few months in early 2023 and required periodic treatment at St. Elizabeth's Hospital.  [*Id.*, p. 4] As a result, Daulton frequently interacted with Price.  According to her testimony, Price had personally treated him over 30 times.  [*Id.*; Record No. 46-20, p. 38]  Approximately one-half hour after Daulton's complaint regarding isolation (at 10:23 a.m.), Price conducted a hands-on intake history and physical assessment with Daulton.  [*Id.*]  She asked questions about suicidal ideation, which he repudiated.  Price concluded that Daulton did not need to be on high watch and recommended that he be returned to the jail's general population.  [*Id.;* Record No. 54-1] Price's recommendation was not followed, however, because New Vista's orders were prioritized.  [*Id.*, p. 5]

Considering the sensitive nature of the isolation cells, KCDC instituted protocols to ensure that inmates on high watch were closely monitored.  [*See* Record No. 54-3.]  In part, such inmates were to be observed every 10 minutes.  [*Id.*]  However, on May 14, 2023, jail staff failed 22 times to monitor Daulton's cell every 10 minutes.  [Record No. 54, p. 5]  Further, there were 3 instances in which staff failed to observe Daulton's cell for periods exceeding 20 minutes in violation of Title 501 Kentucky Administrative Regulation 13:010 Section 5(2) ("Jail personnel shall conduct and document direct, in-person surveillance every twenty (20) minutes, at irregular intervals, on the following classes of prisoners: (a) Suicidal; and (b) Mentally or emotionally disturbed.").  An officer last checked Daulton's cell at 2:37 p.m., or 18 minutes prior to the assault.  [Record No. 54-3, p. 2] "At 2:55 p.m., Jail Deputy Cobb

observed Daulton lying on the floor with Maskiell above him.  Maskiell was kicking and stomping Daulton's face and head.  Immediately following the assault, Maskiell was moved to cell 'B-4', which was unoccupied as was cell 'B-3' next to it."  [Record No. 54, p. 11] Daulton suffered severe brain damage and remained in a coma until his death on May 21, 2023. [*Id.*, p. 11]  "Maskiell pled guilty to Daulton's murder on April 10, 2024."  [*Id.*, p. 5]

## II.  Legal Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *Walden v. Gen. Elec. Int'l, Inc*, 119 F.4th 1049, 1056 (6th Cir. 2024) (citing Fed. R. Civ. P. 56(a)).  To meet this standard, a movant must show that the nonmoving party has failed to produce evidence to support at least one essential element of his or her claim.  *See Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citations omitted)).  And once the moving party satisfies this burden, the opposing party must present "significant probative evidence that establishes more than some metaphysical doubt as to the material facts."  *Golden v. Mirabile Invest. Corp.*, 724 F. App'x 441, 445 (6th Cir. 2018) (citation and alteration omitted).

The Court views the "evidence in the light most favorable to the nonmoving party." *Lang v. City of Kalamazoo*, 744 F. App'x 282, 285 (6th Cir. 2018) (citing *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003).  However, it does not weigh the evidence or make credibility determinations.  Instead, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52 (1986).

- 9 -

## III.  Analysis

### Deliberate Indifference—Failure to Protect

Jones alleges that Daulton's confinement with Maskiell violated his constitutional rights to safe conditions and that the defendants failed to protect him from an obvious risk to his safety.  *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994).  To succeed on a failure to protect claim under the Eighth or Fourteenth Amendment of the United States Constitution under 42 United States Code § 1983, a plaintiff must establish the following elements:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Westmoreland v. Butler Cnty.*, 29 F.4th 721, 729 (6th Cir. 2022) (citing *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

Under the Fourteenth Amendment, the third prong is evaluated under an objective test, whereas the Eight Amendment requires a test based on the officer's subjective mental state.  *Id*.  The Court determined previously that Daulton was a pretrial detainee; however, Daulton's pretrial detainee status is ultimately irrelevant because Jones' claims against Capps and Wehrer cannot survive the first two elements identified in *Westmoreland*.

### Deputy Jailer Jared Capps:

Capps was not deliberately indifferent to Daulton's safety.  Capps concedes the first element of the *Westmoreland* test is satisfied because he made an intentional decision to place

- 10 -

Maskiell in the isolation cell with Daulton.  However, Jones' deliberate indifference claim against Capps falls short on *Westmoreland's* second prong.  Sixth Circuit case law requires that the placement conditions in issue subjected the plaintiff to a substantial risk of harm from an *objective* standpoint.  *See Reedy v. West*, 988 F.3d 907, 912 (6th Cir. 2021) ("For a failure-to-protect claim to lie against a prison official, the plaintiff must show that objectively, he was incarcerated under conditions posing a substantial risk of serious harm.") (cleaned up).

### Daulton was not Particularly Vulnerable

A few examples in which the objective test is satisfied include circumstances involving an inmate's "snitch" status, *see Westmoreland*, 29 F.4th 721, 729; a vulnerable inmate's placement with a violent felon who previously abused multiple other inmates, *see Bishop v. Hackel*, 636 F.3d 757 (6th Cir. 2011); and an instance in which a plaintiff was repeatedly and overtly threatened by the Aryan Brotherhood, *Hamilton v. Eleby*, 341 F. App'x 168, 171 (6th Cir. 2009).

Each case turned on the defendant's particular vulnerabilities, none of which apply to Daulton.  Daulton was not a snitch, nor was he particularly vulnerable compared to the victim in *Bishop*, who "was vulnerable because he was young, small, apparently mentally 'slow,' and did not have experience in jail."  636 F.3d 757 at 766.  Daulton was 67 years old and had lengthy experience as a KCDC inmate.  Further, he complained about placement on high watch, and specifically told nurse Price and deputy Poore that he was in the isolation cell for no reason.  [Record No. 33, p. 6] Price subsequently cleared him for the jail's general population.  [Record No. 54-1]

These circumstances do not resemble those in which the Sixth Circuit had determined that inmates faced an objectively substantial risk of harm. Absent a factor such as a particular animus towards Daulton, Capps' decision was objectively reasonable. In fact, Capps intentionally placed Maskiell with Daulton to *avoid placing him with Cornell*. Finally, in at least some cases, victim-inmates alleged blatant threats were made against them, and still this objective test was not met. *See Reedy*, 988 F.3d 907 at 910 ("West testified that Hensley stated, 'You guys got to move this mother*cker out of my cell' or 'whatever happens ... is going to be onto [you].'"). In contrast, Jones does not allege any conflict existed between Maskiell and Daulton prior to the assault.

### Capps Could Not Objectively Ascertain Maskiell was Dangerous

Jones cannot establish that Capps knew that Maskiell was dangerous, as opposed to being either "strange" or mentally ill. First, she contends that Capps should have known Maskiell posed a threat to Daulton before placing them in the same cell because, ostensibly, "Capps did not have to guess whether Maskiell was violent." [Record No. 54, p. 15] In support, Jones states that Maskiell had blood on his hands, tattoos which included a swastika, the word "monster" on his neck and the word "fearless" on his knuckles, and he punched a steel door in front of Capps. [Record No. 54, pp. 9 and 20] Capps further remarked that after five months on the job as a deputy jailer, Maskiell was the "most odd person [he'd] ever seen walk in th[e] jail." [*Id.*, p. 15] But cumulatively, tattoos, blood on his hands, "odd" behavior, and a single instance in which Maskiell punched a cell door after he was refused a blanket do not objectively establish that he posed a substantial risk of serious harm to Daulton. Further,

declaring that those factors constitute reliable indicators of an inmate's propensity for violence could likely implicate a disproportionately large part of any given jail's population.

Jones next asserts that these indicia should have reasonably prompted Capps to further investigate Maskiell. [*Id.*, p. 20] In support, Jones cites *Richko v. Wayne Cnty.*, 819 F.3d 907 (6th Cir. 2016). There, the Sixth Circuit held that a reasonable jury could find that jail social worker Cameron should have further investigated inmate Gillespie's mental health issues before he killed another inmate. However, a few salient facts separate *Richko* from this case. Notably, the panel found that, viewing the facts most favorably to the plaintiff:

> Cameron (1) was aware of Gillespie's self-reported history of bipolar disorder and schizophrenia, (2) was aware that Gillespie had not taken his medication for these conditions for six days, (3) knew that Gillespie had been arrested the day before for attempted assault with a dangerous weapon, (4) knew that Gillespie had been hospitalized six times for his mental illnesses, and (5) discovered through the MH–WIN system that Gillespie had 2,334 prior encounters with mental-health services and/or providers over the past 11 years (equating to approximately 212 encounters per year since he was 11 years old).

*Id.* at 918. Crucially, the Sixth Circuit applied these facts to both the subjective and objective prongs of the "failure to protect" test. *See id.* at 916 ("Because the analysis of the facts below establishes, for the purpose of overcoming the defendants' motion for summary judgment, that Richko has satisfied the subjective component of *Farmer*'s test, the objective component is likewise satisfied based on the same factual analysis.").

Here, Capps' observation that Maskiell was "odd," saw blood on his hands, and observed his tattoos is not enough to require deeper evaluation into Maskiell's background, whereas in *Richko* much more information was available. In *Richko*, the defendant was allegedly aware that the dangerous inmate had *2,334 prior "mental health encounters"* over the previous 11-year period, and that the defendant was arrested for attempted assault with a

- 13 -

dangerous weapon *the day before*, yet he still decided not to investigate further. Jones does not argue that Capps knew about Maskiell's violent tendencies. Instead, she alleges that Capps should have investigated further and figured it out. This calculus could change, if, for example Capps had known or should have known that Maskiell possessed a propensity for violence. But under the facts presented, Capps did not objectively put Daulton at risk of serious harm, and holding otherwise would constitute "judicial micromanagement of jailers' daily affairs." *Westmoreland*, 29 F.4th 721, 731 (6th Cir. 2022) (Bush, J., dissenting).

**Deputy Jailer Kristin Wehrer:**

Jones' failure-to-protect-claim against Wehrer begins and ends with the first element of the *Westmoreland* test because Wehrer had no input into Daulton's cell placement. Capps made the decision to place Maskiell with Daulton, not Wehrer. Acknowledging that even if Wehrer fabricated inaccurate responses to the inmate intake form *and* overlooked information that indicated Maskiell was not a stable person, she still lacked any control over the conditions of Daulton's confinement. Without opining on whether Wehrer was negligent in falsely responding to prompts on the intake sheet, Wehrer simply called New Vista and followed their recommendation as binding in accordance with jail procedures. Jones does not allege that Wehrer "made an intentional decision with respect to the conditions under which [Daulton] was confined" because Wehrer did not make *any* decision on the issue. *Westmoreland*, 29 F.4th at 729.

Even construing Wehrer's actions as a decision that led to Maskiell's placement with Daulton, no reasonable jury could find Wehrer's actions *intentionally* led to their assignment to the shared "isolation" cell. This conclusion is further bolstered by Jones' assertion that

"*Capps* determined that it 'would be the safest option for everyone involved' if … [Maskiell] was placed with John Daulton."  [Record No. 33, p. 10 (emphasis added).]  She is not liable because Jones does not plausibly assert that Wehrer made an intentional decision regarding the conditions of Daulton's confinement,  Therefore, the plaintiff's claims for deliberate indifference contained in Counts One and Four will be dismissed.[6]

### *Monell* Claims

The defendants assume that Jones' claims under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), necessarily fail following dismissal of the individual capacity deliberate indifference claims against Wehrer and Capps.  However, *Monell* claims are based on a *municipality's* deliberate indifference and, within the Sixth Circuit, a constitutional violation can be established without individual liability.  The Sixth Circuit clarified this principle in another case involving the same defendant.  *See Grote v. Kenton Cnty.*, 85 F.4th 397, 414 (6th Cir. 2023) ("[W]e note that it is proper to consider possible constitutional violations committed by a municipality *qua* municipality, even in the absence of a showing of a constitutional violation by any one individual officer."); *see also Stucker v. Louisville Metro Gov't*, No. 23-5214, 2024 WL 2135407, at *5 (6th Cir. May 13, 2024) ("'[S]ituations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation.'" (quoting *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002))).

---

[6]    The plaintiff's general "deliberate indifference" claims in Count I will also be dismissed because they are duplicative of her "failure to protect" claims raised in Count IV.

- 15 -

Defendant Kenton County points out that "'a municipal policymaker cannot exhibit fault rising to the level of deliberate indifference to a constitutional right when that right has not yet been clearly established.'" *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 994 (6th Cir. 2017) (quoting *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012)). On this topic, the Sixth Circuit reasoned that "deliberate indifference's subjective-culpability requirement arguably plays a role in choosing the appropriate level of generality for a given right. It justifies somewhat less granular principles than, say, Fourth Amendment cases involving split-second decisions where officials genuinely—but perhaps mistakenly—believe their actions to be appropriate." *Finley v. Huss*, 102 F.4th 789, 810 (6th Cir. 2024).

In the context of deliberate indifference to inmate safety, the Sixth Circuit found "prison officials were deliberately indifferent to an inmate's safety by subjecting her to dangerous work conditions at her prison job." *Id.* (citing *Rhodes v. Michigan*, 10 F.4th 665 (6th Cir. 2021)). Judge Thapar dissented in *Rhodes*, arguing that "[i]t is not clearly established law that a workplace *injury* can amount to an unconstitutional punishment just because it happened in prison." *Rhodes*, 10 F.4th at 689 (Thapar, J., dissenting). He contended that the meaning of qualified immunity's "clearly established" language never previously applied to unsafe prison working conditions, yet the majority expanded it to allow for liability.

In contrast, the purported constitutional violation here is not nearly as abstract or unforeseen as a workplace injury, nor is it a matter of first impression. In fact, the Court faces an arguably more egregious version of the baseline right the United States Supreme Court articulated in *Farmer v. Brennan,* 511 U.S. 825 (1994). *See id.* at 833 ("prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners … [because they

have] … stripped them of virtually every means of self-protection and foreclosed their access to outside aid.").

In this case, the fact that Maskiell and Daulton were confined together in an "isolation" cell only strengthens the "clearly established" prong, because, similar to *Farmer*, Daulton's cell placement subjected him to conditions in which he was forced to depend on jail staff for protection.   And the Sixth Circuit has already endorsed this determination in similar circumstances.   *See Richko v. Wayne Cnty.*, 819 F.3d 907, 915 (6th Cir. 2016) ("The constitutional right at issue in this case—Horvath's right to be free from violence at the hands of other inmates—was clearly established by the Supreme Court in *Farmer*."), *abrogated on other grounds by Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021).   Kenton County is correct that *Richko* is inapposite in terms of individual liability—but its qualified immunity analysis turned on "inmate on inmate" violence, as it does here.   And notably, "[a]ll that is required is a sufficiently analogous case (or cases) from which a 'reasonable official would understand that what he is doing violates that right.'"   *Rhodes*, 10 F.4th at 679 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Finally, the facts in *Richko* are sufficiently close to those presented here to conclude that Kenton County potentially violated a clearly established right.   In that case, the Sixth Circuit specifically applied the Supreme Court's holding in *Farmer* to another situation involving "the constitutional right to be free from inmate-on-inmate violence" to the Fourteenth Amendment's guarantee of due process for pretrial detainees like Daulton.   819 F.3d at 915.   The victim in *Richko* was also assaulted and killed by a mentally ill inmate who was placed in the same cell.   Thus, applying longstanding precedent, Daulton's right to safety

- 17 -

from Maskiell was clearly established, even though Capps and Wehrer did not violate that right *individually*.

Liability may extend to a governmental entity under § 1983 only when its official custom or policy causes a violation of constitutional rights. *Monell*, 436 U.S. 658, 691 (1978). The Sixth Circuit recognizes four distinct ways to demonstrate an unlawful policy, practice, or custom under *Monell*. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). "These avenues include: (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Franklin v. Franklin Cnty.*, 115 F.4th 461, 470 (6th Cir. 2024) (citing *Thomas*, 398 F. 3d at 429) (internal quotation marks omitted).

At the motion to dismiss stage, the undersigned reaffirmed that "[o]ne way to prove an unlawful policy or custom is to show a policy of inadequate training or supervision." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 478, 387 (1989)). Because Jones does not allege multiple constitutional violations, she must show "a single violation of federal rights, accompanied by a showing that the municipality has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Helphenstine v. Lewis Cnty*, 60 F.4th 305, 323 (6th Cir. 2023) (citing *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997) (cleaned up)).[7]

---

[7]    Jones' official capacity claims against Jailer Fields will be dismissed, because they are duplicative of her claims against Kenton County. In addition, because the Sixth Circuit has not recognized an avenue to establish an unlawful custom with single incident liability" absent

**Failure to Train or Supervise**

To prove a municipality is deliberately indifferent, a plaintiff "must show (1) that the County's 'training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.'" *Helphenstine*, 60 F.4th at 323 (6th Cir. 2023) (citing *Winkler v. Madison Cnty.*, 893 F.3d 877, 902 (6th Cir. 2018)). Based upon existing precedent, it seems the only way to establish "single incident" liability regarding an unlawful custom is through a failure to train or supervise. Thus, even though Jones has presented multiple customs that could lead to constitutional violations, single incident liability has not been expanded to those situations.

**Adequacy of Kenton County's Training and Supervision**

Jones sufficiently demonstrates that a reasonable jury could find supervision regarding information retention, isolation for suicidal and dangerous prisoners, and cell placement was inadequate. First, officer Rose was never asked to fill out the answers on the inmate intake assessment form in her six years of service, and this was corroborated by officer Matthews. Wehrer also admitted to: (1) failing to ask the appropriate questions; and (2) falsely checking "no" answers on the assessment. Allegedly, this was a longstanding trend that was not addressed by any supervisory staff at KCDC. Next, concerning any minimal data regarding inmates that may be recorded beyond the booking stage, JailTracker alerts only account for

---

a "failure to train or supervise" component, Jones' *Monell* claims will be solely analyzed through the latter lens. *See, e.g., Helphenstine*, 60 F.4th at 323 (6th Cir. 2023) ("Plaintiff has not identified any other constitutional violations, so she must demonstrate that the single violation (Helphenstine's death) was accompanied by Lewis County's failure to train the jailers to handle this potentially recurring situation.").

inmate events that occurred at the KCDC (and even those were not always tracked). This was further acknowledged by Robinson. But for some reason, the system was not improved even after Daulton's death.

The most concerning allegations involve the jail's procedure for placing mentally ill inmates on high watch. KCDC contracts with New Vista which is neither unusual nor improper. However, New Vista speaks only to detention center employees, and not to inmates. Therefore, all determinations are based upon secondhand information. Despite this procedure, New Vista determines which inmates are assigned to isolation cells. But New Vista staff was unaware that only four isolation cells were utilized. Therefore, it was not aware that mentally unstable and vulnerable inmates were being placed in isolation cells together. Further, KCDC did not utilize other open cells to alleviate the potential danger presented by its procedures. Finally, according to Jones, "deputies believe that the opinions provided by New Vista are Gospel, thereby relinquishing them of their discretion to deal with doubling up inmates in isolation cells." [Record No. 54, p. 3]

Taking the facts in the light most favorable to Jones, jail management did not address or remedy the practice which arguably led to Daulton's death with adequate training or supervision. A reasonable jury could find Daulton's death under these circumstances was "a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Shadrick*, 805 F.3d at 739.

### Deliberate Indifference

Following Daulton's death, KCDC did not update the JailTracker system to reflect that Maskiell killed another detainee within the KCDC. *Shadrick*, 805 F.3d at 739 ("The conduct

of SHP staff both before and after Butler's death is relevant to whether SHP's failure to train and supervise its LPN nurses reflected a deliberate or conscious choice."). Further, the placement opinions of staff on site were not followed in favor of a third party with no ability to monitor or adjust to conditions existing at the detention center. Rather than adjust protocol, KCDC provided only four cells for mental health related isolations, even though other cells were available in other areas of the detention center. Here, Maskiell was moved to a different cell only after his assault of Daulton. [Record No. 54, p. 11] These informal customs were longstanding, yet KCDC presents little evidence that it trained or supervised staff to address these problems in the period leading up to this action. And it fails to demonstrate what, if anything, changed afterwards.

### Proximate Cause

A reasonable jury could conclude that had detention center employees received greater supervision, had detention center employees been able to utilize available information regarding violent detainees, and/or had staff coordinated their actions with New Vista clinicians, Daulton might not have been beaten to death.

### Gifford v. Hamilton County

On May 30, 2025, the Sixth Circuit handed down a ruling in *Gifford v. Hamilton County*, No. 24-5893, 2025 WL 1541805, (6th Cir. May 30, 2025). *Gifford* marks one of the first instances in which the Sixth Circuit addressed *Monell* claims under similar facts and circumstances to those of the present case. The case is particularly instructive concerning differences between *Monell* claims that should be dismissed, and those that should proceed to trial. A few crucial differences separate *Gifford* from the events that transpired here.

In *Gifford*, the plaintiff ("Gifford") attended a school reunion at a classmate's house and was drinking. *Id.* at *1. Because he did not want to drive home intoxicated, and his phone was dead, he walked to a neighbor's house to see if the neighbor would call a cab for him. In response, the neighbor called the police. *Id.* Gifford was arrested for public intoxication and criminal trespass (but charges that were later dropped). Thereafter, he was booked at the Hamilton County Jail, where all inmates are initially classified as maximum security, "'because classification is a process that requires retrieving information from a variety of sources,' which can be time-consuming." *Id.* The next morning, another inmate with an alleged history of violence who was arrested for assault—Brown—was placed in Gifford's cell. "[U]nder normal practices, detainees are 'not segregated during the intake and booking process based only on the charges alleged against them,' so 'a detainee [who] behaves appropriately' during the process isn't separated from other detainees." *Id.* Brown assaulted Gifford in the cell.

Addressing Gifford's failure to train or supervise *Monell* claim, the panel noted that Gifford could not "show that the risk in this case was so obvious and likely to recur that the county's failure to train or supervise can be established by a single incident." *Id.* at *4. It reached this conclusion based on established principles that "during initial intake and booking 'the offense of arrest is not a reliable indicator of dangerousness; and even if it was there is often insufficient information about each new detainee's criminal history in order to make that assessment.'" *Id.* (quoting *Sumpter v. Wayne County*, 868 F.3d 473, 481 (6th Cir. 2017)). Here, however, Daulton's assault happened after the booking process. At that stage, pertinent information on inmates was purportedly available. But KCDC staff allegedly did not collect

- 22 -

or aggregate available information after booking. Unlike KCDC, the jail in Gifford implemented its "maximum-security" system "because classification is a process that requires retrieving information from a variety of sources." *Id.* at *1.

Second, Gifford argued that "the county's official policy caused a constitutional deprivation because it placed non-violent offense detainees like him in the same cell as those accused of violent crimes" and that the jail's policy of grouping all inmates who "behave[d] *appropriately* in the temporary holding cell" *together* caused a constitutional violation. *Id.* at *4; *id.* at 1 (emphasis added). Here, Jones alleges that KCDC (through a lack of training and supervision) routinely placed the most dangerous and vulnerable inmates together when they should be isolated. Hamilton county placed inmates together in cells at booking when they exhibited normal behavior. But Jones alleges KCDC and New Vista placed the most mentally unstable and suicidal inmates together when they were supposed to have their own cells. For these reasons, this case is distinguishable from *Gifford*. Thus, at this stage, Jones' *Monell* claim in Count III will proceed to trial.

### Kentucky Wrongful Death and Punitive Damages Claims

Initially, Capps and Wehrer contend that they are entitled to summary judgment regarding the wrongful death claims because Jones has already conceded that Daulton had no earning power. Wrongful death claims are separate and independent claims that arise upon a decedent's death and belong to enumerated statutory beneficiaries. *Ping v. Beverly Enters., Inc.*, 376 S.W. 581, 598-99 (Ky. 2012). The wrongful death statute provides:

> [W]henever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it, or whose agent or servant caused it. If the act

- 23 -

> was willful or the negligence gross, punitive damages may be recovered.  The action shall be prosecuted by the personal representative of the deceased. . . .

K.R.S. § 411.130.

Damages under the wrongful death statute compensate for the loss of the decedent's earning power and are not intended to include the affliction to the family as a result of the wrongful death. *Giuliani v. Guiler*, 951 S.W.2d 318, 323 (Ky. 1997).  However, damages for wrongful death in Kentucky can include more than just loss of earnings.  "[B]eneficiaries … can only claim loss of earning power, medicals, and funeral expenses under a wrongful death claim."  *Pete v. Anderson*, 413 S.W.3d 291, 303 (Ky. 2013) (Noble, J., concurring).  *See also Boarman v. Com.*, 37 S.W.3d 759, 763 (Ky. 2001) ("In a wrongful death action, the damages recoverable are funeral expenses and damages that will fairly and reasonably compensate the decedent's estate for the destruction of his power to earn money.") (Stumbo, J., dissenting).  But the Court must determine whether Capps and Wehrer are entitled to qualified immunity before addressing the state claims.

The defendants do not address the qualified immunity defense in their motion for summary judgment.  However, because they raised the defense in their answer, and at the motion to dismiss stage, the Court will nonetheless evaluate whether it applies.[8]  As the undersigned previously clarified, qualified immunity under Kentucky law shields an official sued in his individual capacity from tort liability resulting from his negligent performance of (1) discretionary acts, (2) made in good faith, and (3) within the scope of his authority.  [Record No. 14 (citing *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).]

---

[8]    The defendants also raised the qualified immunity defense in their first motion for summary judgment filed before discovery was conducted.  [Record No. 6]

- 24 -

**Capps:**

Jones previously argued that Capps is not entitled to qualified immunity because his "decision" to place Maskiell with Daulton was a ministerial determination, not a discretionary choice. [Record No. 14, p. 15, n.8] *See Yanero*, 65 S.W.3d 510, 522 ("An act is not necessarily 'discretionary' just because the officer performing it has some discretion with respect to the means or method to be employed." (citing *Franklin County v. Malone*, 957 S.W.2d 195 (1997))). But this argument completely contradicts Jones' theory of deliberate indifference. If Capps truly had no choice but to place Maskiell with Daulton, then it follows that he likely could not have "made an intentional decision with respect to the conditions" in which Daulton was confined. *Westmoreland*, 29 F.4th at 729.

However, Jones argument also fails because Jail Policy 3.4.8 does not specifically outline which cell(s) or under what conditions placement should happen. Rather, it lists "safe cell or single cell if violent" for inmates on high watch. [Record No. 6-8, p. 9] Capps' decision to place Daulton and Maskiell together was deliberate. Next, Capps acted in good faith. While his actions may have been negligent, even Jones acknowledges he took efforts to avoid placing Maskiell with Cornell based on Maskiell's swastika tattoo and use of a racial slur. Instead, Capps decided to place Maskiell with Daulton because he thought it would be safer for everyone. Jones presents no evidence that Maskiell intended for Daulton to be assaulted, or that he possessed malicious motives. Finally, Maskiell's cell placement was well within the scope of his authority as a deputy jailer. Cell placement of prisoners assigned to high watch by New Vista was a routine task expected of Capps. Consequently, Capps is shielded by qualified immunity.

**Wehrer:**

Regarding the state claims against Wehrer, the wrongful death and punitive damages claims in Counts V and VI claims will also be dismissed, because Jones cannot establish proximate cause between Wehrer's actions and Daulton's death. In other words, even absent qualified immunity, Jones cannot prove that Maskiell actions were a reasonably foreseeable consequence of her omissions on the inmate intake assessment form. And even factual cause is questionable. If Wehrer asked officer Rose the required questions on the form, it is uncertain whether it would have impacted New Vista's placement decision. Because New Vista was unaware there were only four isolation cells, it likely would have still recommended Maskiell for high watch, which would have left Capps with the same decision. Next, even presupposing the existence of a "but-for" causal link between Wehrer's omissions and Daulton's cell placement, Daulton's death is simply too attenuated from Wehrer's assessment to allow for liability, especially because Capps was the ultimate decision maker with discretion over the cell in which Maskiell would be placed (a quintessential example of intervening cause). Accordingly, the wrongful death claims in Count V will be dismissed. And consequently, the separate claim for punitive damages in Count VI will also be dismissed in the absence of any Kentucky-law claims.

### IV. Conclusion

Based on the foregoing analysis, it is hereby

**ORDERED** that the defendants' Motion for Summary Judgment [Record No. 46] is **GRANTED**, in part, and **DENIED**, in part, consistent with this Memorandum Opinion and Order. Plaintiff Tonya Jones' "Failure to Train or Supervise" Deliberate Indifference *Monell*

Claim against Kenton County in Count III will survive summary judgment. Jones' claims in Counts I, II, IV, V, and VI are dismissed.

Dated: June 4, 2025.

Danny C. Reeves, District Judge
United States District Court
Eastern District of Kentucky